# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| REUBEN MILLER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:13-cv-619 (VAB) |
| | : | |
| CITY OF NEW LONDON, et al., | : | |
| | : | |
| Defendants. | : | |

## <u>RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiff, Reuben Miller, alleges that Defendants, the City of New London ("City" or "New London"), Sergeant Robert Pickett, Officer Joseph Pelchat, Officer Josh Bergeson, and Officer Kurt Lavimoniere of the New London Police Department ("NLPD"), and Michael Kuchyt of the New London Fire Department deprived him of his rights under the Fourth and Eighth Amendments in violation of 42 U.S.C. § 1983, and that the NLPD members and Firefighter Kuchyt committed common law torts against him. Defendants have filed a Motion for Partial Summary Judgment [Doc. No. 76], and seek to dismiss the claims against the City, Sergeant Pickett, and Firefighter Kuchyt. For the following reasons, Defendants' motion is GRANTED with respect to the City and Firefighter Kuchyt, but DENIED with respect to Sergeant Pickett.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On December 14, 2011, Hillary Lisowski drove her friend, Reuben Miller, to the Southeastern Council on Alcoholism and Drug Dependence, Inc. ("SCADD") for detoxification from alcohol. *See, e.g.*, Compl. ¶¶ 18-19; Lisowski Dep. 11:20-12:5; Miller Dep. 25:8-17. A

---

[1]    A review of the pleadings, Local Rule 56 Statements, and exhibits accompanying the filings of the parties is the basis for this factual summary.

registered nurse at the facility, Ann Crane, met Mr. Miller and Ms. Lisowski outside the facility in order to admit him.  *See*, *e.g.*, Crane Dep. 9:6-15.  SCADD personnel administered a Blood Alcohol Content ("BAC") test, which registered Mr. Miller's BAC at 0.38.  *See*, *e.g.*, Pl. Ex. 1, at 1; Pl. Ex. 2, at 1; Pl. Ex. 9.  Shortly after his arrival, Mr. Miller decided that he did not wish to be admitted.  *See*, *e.g.*, Crane Dep. 9:16-23, 12:11-15.  At one point, Mr. Miller entered the SCADD facility, but then went back outside and urged Ms. Lisowski to take him home.  *See*, *e.g.*, *id.*  As Nurse Crane tried to convince Mr. Miller that he should be admitted, he grew visibly upset and threw and broke his eyeglasses.  *See*, *e.g.*, *id.* at 10:25-11:6.

Given that Mr. Miller was highly intoxicated and "emotionally distraught," Nurse Crane determined that he was "unsafe to go home" and decided to call an ambulance.  *See*, *e.g.*, *id.* at 12:16-18, 49:4-8.  The audiotape of the call recorded the following conversation:

| | |
|---|---|
| Dispatch: | 911.  What's your emergency? |
| Nurse Crane: | This is Ann Crane from SCADD detox.  We have a very intoxicated young man who is refusing to get out of his fiancee's car.  He's already been somewhat destructive[2] and getting violent. |
| Dispatch: | Is he in your care or is he not? |
| Nurse Crane: | Well, we had him inside and now he's outside.  I need him to go to the hospital, and I think that we need to have a police car. |
| Dispatch: | All right.  He's in what kind of car out front? |
| Nurse Crane: | He's by the front -- he's by the side door, so in case some -- where they usually come up the driveway he'll be there. |
| Dispatch: | All right. |
| Nurse Crane: | Okay. |
| Dispatch: | So you need a cop, not an ambulance. |
| Nurse Crane: | I need both, ma'am. |
| Dispatch: | All right. |
| Ms. Crane: | Okay.  Thank you.  Bye. |

Crane Dep. 33:12-34:8.

City firefighters Michael Kuchyt and Michael Coleman, assigned to the ambulance division, arrived first on scene in response to the call.  *See*, *e.g.*, Compl. ¶ 22; Kuchyt Dep. 5:6-

---

[2]     Nurse Crane contends that she said Mr. Miller was "somewhat disruptive," *see*, *e.g.*, Crane Dep. 12:21-25; Pl. Ex. 7, at 2, although there is nothing in the record correcting the deposition transcript's reporting of the 911 call conversation as using the words "somewhat destructive."

16; Coleman Dep. 5:20-6:1.  They got out of the ambulance, spoke to SCADD personnel, and saw Mr. Miller either sitting on or walking near a bench outside the SCADD building.  *See*, *e.g.*, Coleman Dep. 5:20-6:1, 6:17-21; Kuchyt Dep. 5:23-6:13, 7:5-11.  They did not approach Mr. Miller.  *See*, *e.g.*, Kuchyt Dep. 9:3-5.  Officer Joseph Pelchat arrived next.  He had been informed by dispatch that there was an intoxicated male who was refusing to get out of a car to go to the hospital.  *See*, *e.g.*, Pelchat Dep. 5:1-24; Pl. Ex. 7, at 2.  Once Officer Pelchat arrived on scene, it is not clear whether he attempted to gather any further information from the ambulance personnel who were already on scene or from SCADD personnel.  *See*, *e.g.*, Pelchat Dep. 7:2-14, 8:12-9:3; Kuchyt Dep. 10:7-24; Pl. Ex. 2, at 2.  However, Firefighter Coleman testified that he did tell Officer Pelchat "the basics of what was going on" before Officer Pelchat approached Mr. Miller.  Coleman Dep. 11:18-12:16.

When Officer Pelchat arrived, Mr. Miller had been asking Ms. Lisowski to take him home, while they were standing next to her car.  *See*, *e.g.*, Lisowski Dep. 32:10-33:21; Pl. Ex. 2, at 2.  Officer Pelchat testified that he could not hear what Mr. Miller was saying, but he thought Mr. Miller "was going to possibly assault the girl."  Pelchat Dep. 9:9-20.  Ms. Lisowski testified that Mr. Miller was trying to give her a hug when Officer Pelchat approached him.  Lisowski Dep. 35:14-17.  She also testified that when Mr. Miller was trying to hug her, she said, "Get away from me," and that when Officer Pelchat approached, he asked her if she wanted Mr. Miller to leave her alone and she responded, "Yes, get him away from me."  Lisowski Dep. 34:20-35:2.

Officer Pelchat, who had come up behind Mr. Miller, then attempted to restrain him physically.  *See*, *e.g.*, Compl. ¶¶ 24, 26; Pelchat Dep. 7:2-14, 9:16-10:10; Kuchyt Dep. 10:7-11:23; Pl. Ex. 1, at 1; Pl. Ex. 2, at 2.  There is a dispute regarding what, if anything, Officer Pelchat said to Mr. Miller at the time, including whether he announced himself as a police

officer.  *See*, *e.g.*, Pelchat Dep. 9:14-17, 10:17-21; Kuchyt Dep. 10:9-14, 10:25-11:6; Coleman

Dep. 12:3-16; Lisowski Dep. 34:18-35:20; Pl. Ex. 1, at 1; Pl. Ex. 2, at 2; Pl. Ex. 3.  At the time of

the incident, Mr. Miller was six feet, two inches tall and weighed 190 pounds.  Miller Dep. 98:2-

6.  In contrast, Officer Pelchat was much smaller in size.  *See*, *e.g.*, Lisowski Dep. 34:4-12; Pl.

Ex. 3.  During the ensuing physical struggle, Officer Pelchat requested assistance from the

NLPD on his radio.  *See*, *e.g.*, Pelchat Dep. 11:17-19.  He also asked for assistance from the

firefighters on scene.  Near the beginning of the physical altercation, Officer Pelchat jumped on

Mr. Miller's back and then may have been thrown off of it by Mr. Miller and into a fence.[3]  *See*,

*e.g.*, Lisowski Dep. 44:10-13.  Firefighter Kuchyt, who feared Officer Pelchat might be injured

by Mr. Miller, attempted to answer Officer Pelchat's request for assistance by holding onto one

of Mr. Miller's arms.  *See*, *e.g.*, Kuchyt Dep. 16:22-17:1, 18:24-25.

Shortly thereafter, Officer Josh Bergeson and Dr. Tabatha Maiorano, a licensed social

worker who was working with Officer Bergeson that evening, arrived at SCADD.  *See*, *e.g.*,

J. Bergeson Dep. 8:7-19, 9:5-14; Maiorano Dep. 8:7-19.  Firefighter Kuchyt then stepped away.

*See*, *e.g.*, Kuchyt Dep. 18:13-19, 19:18-23.  Officer Bergeson and Dr. Maiorano both joined

Officer Pelchat in attempting to restrain Mr. Miller.  *See*, *e.g.*, Maiorano Dep. 10:6-21.  Officer

Lavimoniere arrived next, and, at that point, Dr. Maiorano stepped away from Mr. Miller, as the

three officers together attempted to restrain Mr. Miller.  *See*, *e.g.*, Maiorano Dep. 12:3-12.

Sergeant Pickett, a fourth NLPD officer, arrived and observed Officer Lavimoniere

restraining Mr. Miller's legs, while Officers Pelchat and Bergeson were trying to control Mr.

Miller's hands.  *See*, *e.g.*, Pickett Dep. 6:16-7:3.  At some point, Sergeant Pickett activated his

NLPD-issued TASER and stated that he would use it if Mr. Miller did not comply with the

---

[3]      Other witnesses raise the possibility that Officer Pelchat may have initiated the action at the fence.  *See*, *e.g.*, Pl. Ex. 2, at 2 ("Then the officer ran Reuben into the fence."); Pl. Ex. 5 ("[Officer Pelchat] tried to restrain [Mr. Miller] 1st against the fence[.]").

NLPD officers' orders.  *See*, *e.g.*, *id.* at 8:6-10.  The NLPD officers ultimately took Mr. Miller into custody and charged him with interfering with police and breach of peace.  *See*, *e.g.*, Def. Ex. H.

Officer Lavimoniere drove Mr. Miller to a police station for processing.  On the way, Mr. Miller complained to Officer Lavimoniere that he could not breathe and indicated that he was in significant physical pain, an incident captured on the police camera located in the police car.  *See*, *e.g.*, Pl. Ex. M; Pl. Ex. 8, at 6.  Mr. Miller has no independent recollection of his encounter with the NLPD on December 14, 2011.  *See*, *e.g.*, Miller Dep. 29:4-6, 47:12-17, 48:19-22.

During the course of the arrest, the police officers used varying degrees of force against Mr. Miller before arresting him, including force employed by use of their hands, knees, and OC spray.  *See*, *e.g.*, Pl. Ex. 7; Pl. Ex. 8.  Lawrence and Memorial Hospital records indicated that, in addition to his acute alcohol intoxication, Mr. Miller had multiple contusions, a minor head injury, and a right rib contusion, and received an intravenous Sodium Chloride 0.9% solution and intravenous Ativan.  *See*, *e.g.*, Pl. Ex. 28.  Hospital staff also recommended "[i]ce to the bruised area, particularly to the area of his right eye and right rib area," "Tylenol or Motrin as needed for pain," and to "[s]top drinking alcohol and proceed with detox."  *See*, *e.g.*, *id.* at 11.  Mr. Miller returned to the hospital emergency room the next day, and, after x-rays were taken, was diagnosed with a fractured rib.  *See*, *e.g.*, Pl. Ex. 29.

At the time of the incident—December 2011—Officers Pelchat, Bergeson, and Lavimoniere were current with all of their official NLPD training.  *See*, *e.g.*, Pickett Aff. ¶ 11.  Further, NLPD General Order 4.53 ("Policy" or "General Order") established "the policy of the New London Police Department that officers will use only that force which is reasonable [*sic*] necessary to effectively bring an incident under control, to effect an arrest, and to protect officers and others."  Def. Ex. I, at 1.  Updated as recently as six months prior to this incident, this policy

required officers to use only that amount of force which is "objectively reasonable, based upon the totality of the circumstances known or perceived by him or her at the time force is used." *Id.* at 2.  The use of physical force is to end when "a. Resistance ceases and/or b. The officer has accomplished the purpose necessitating the use-of-force." *Id.*  "Officers faced with an uncooperative individual, such as one who refuses to be placed in custody, may use compliance and control techniques to gain control and compliance while minimizing the risk of injury to the officer, the person being placed in custody, or innocent bystanders." *Id.* at 6.

The General Order also detailed a process for officers reporting on the use of force. Officers are supposed to "notify the shift commander of the details involved, as soon as circumstances allow" and "complete a departmental Use-of-Force Report" when they "are directly involved in a use-of-force incident that results in, or is alleged to have resulted in, injury to or death of another person." *Id.* at 9.  The Use-of-Force Report is to "be completed before the end of the shift and forwarded to the shift commander on duty at the time of the incident." *Id.* This report "shall include all pertinent details." *Id.*  The Use-of-Force Report form listed the following options for reporting: "INJURY TO PERSON FROM USE OF PHYSICAL FORCE"; "FIREARM DISCHARGE"; "USE OF WORKING K-9"; "TASER/SIM"; "USE OF O.C. SPRAY".  Pl. Ex. 16.

In addition to the completion of the Use-of-Force Report, the NLPD requires that incident or arrest reports "[c]ontain a detailed explanation of the use-of-force."  Def. Ex. I, at 9.  The incident or arrest reports filed by the officers involved in this altercation did include some information regarding the use of force applied by their bodies.  Officer Pelchat stated in his initial arrest report that he "actively fought with the male to place him under arrest for nearly thirty seconds."  Def. Ex. H.  In his supplemental arrest report, "Officer Lavimoniere stated that

in attempt to gain compliance from Miller, he struck Miller three separate times with a closed fist 'just above' Miller's left hip to get him to comply."  Pl. Ex. 7, at 6.

After this incident, Officer Bergeson completed a Use-of-Force Report, where he reported his use of OC spray, but not any of his bodily use of force, against Mr. Miller.  He did not believe it was necessary.  Similarly, Officers Pelchat and Lavimoniere did not complete a Use-of-Force Report at all.  Officer Lavimoniere stated that he did not report it on the Use-of-Force Report because he did not use a gun, TASER, or other weapon during the incident, only using his body in trying to subdue Mr. Miller.  *See*, *e.g.*, T. Bergeson Dep. 65:4-7, 65:23-25.  He believed that he was not required to report any use of force that involved contact with the officers' bodies, *i.e.*, hands and knees, on that form, but were required to report any incidents involving firearms or any other instrument.  *See*, *e.g.*, *id.* at 65:23-66:17.  Officer Bergeson gave an identical explanation regarding why he only reported his use of OC spray and did not report his closed fist strikes to Mr. Miller's head.  *See*, *e.g.*, Pelchat Dep. 16:9-14.

The NLPD conducted two investigations of the incident.  First, there was an informal use-of-force review, conducted by Sergeant L. J. Keating, and subsequently, there was an administrative review, conducted by then-Lieutenant Todd Bergeson, who is now a captain.  Sergeant Keating reviewed police reports, witness statements, medical records, and other items.  *See* Pl. Ex. 7, at 3-4.  During the course of his investigation, Sergeant Keating required the police officers involved in the incident to submit incident memoranda.  From these, he learned new information that was not included in the initial police reports.  For example, Officer Pelchat stated that he had applied pressure point compliance behind Mr. Miller's ear, which was a detail that had not been previously reported.  *See id.* at 6.  Similarly, this was where Officer Bergeson first reported that he had struck Mr. Miller twice in the face with a closed fist.  *See id.* at 7.  One major focus of Sergeant Keating's investigation appears to have been examining why none of the

officers had turned on their body microphones or other recording devices prior to or during the incident.  *See id.* at 6-8.

The second review was an "administrative review" with the goal of determining where the NLPD "possibly lacked in our abilities, equipment and procedures" and "to delve deeper into technical[] and administrative functions that possibly failed, and how [the NLPD] can correct these issues to ensure they are not repeated."  Pl. Ex. 8, at 1.  Among other things, Captain Bergeson concluded that the 911 dispatcher "did not dispatch this call appropriately," that it "should have been dispatched as a two man call," and that if it had been dispatched appropriately, "this incident may not have escalated to the level that it did."  *Id.* at 2; *see also id.* at 5-6.  Captain Bergeson also concluded that the various failures related to recording the incident demonstrates that the NLPD needs better technology, as well as more training with the technology currently in use.  *See id.* at 4.  Captain Bergeson acknowledged that until Mr. Miller was decontaminated from the OC spray, there existed a continuation of the use of force, and he proposed new NLPD procedures on decontamination.  *Id.* at 4-5.

Most significantly, Captain Bergeson concluded that inconsistencies in reporting "seems to be a severe problem."  *Id.* at 6-7.  Specifically with respect to the NLPD's use-of-force reporting, Captain Bergeson testified as follows:

> Q.      . . . [Officer Lavimoniere] said that there was no place on the [use of force] report for him to check off.  Correct?
> A.      Correct.
> Q.      So what does this 'injury to person from use of physical force' mean?
> A.      It's the box that injury did occur based on the types of force that were utilized down below.
> Q.      Okay.  But it said "check all that applies."  So wouldn't that be if you punched somebody or kneed them in the side, wouldn't that be injury to person from use of physical force?
> A.      It would be.
> Q.      Okay.  But Officer Lavimoniere said that he didn't find any place to check off. . . . Right?
> A.      If that's what he said.
> . . .

8

> Q.     And we can agree that if Officer Lavimoniere is right, that no person, no police officer would ever have to report that they punched or kicked a suspect if there was no place on this form to put it.  Right?
>
> . . .
>
> A.     Yeah, that's what they can assume.

T. Bergeson Dep. 65:23-66:17, 67:8-14.  For example, Officer Lavinmoniere failed to report that Mr. Miller stated that he could not breathe.  *See id.* at 6, 8.  Officer Bergeson did not report that he struck Mr. Miller.  *See id.* at 6.  Indeed, none of the officers involved in the incident filed a Use-of-Force Report indicating that any of them had struck Mr. Miller, although some of this information was contained in the incident or arrest reports filed.

Subsequent to Mr. Miller's encounter with the Defendants at SCADD, the NLPD adopted a revision to General Order 4.53, effective as of November 9, 2012.  Pl. Ex. 15.  Unlike the Use of Force policy in effect at the time of Mr. Miller's incident and the resulting internal reviews, the amended policy explicitly states that a departmental Use-of-Force Report form must be completed when a use-of-force incident resulting or allegedly resulting in injury or death to another person involved "the use of any impact weapon, such as hands, feet, baton, or any other measures available at the time of contact."  *Id.* at 9.  In addition, the Use-of-Force Report form itself has also been changed subsequent to Mr. Miller's incident, and now includes a clear place for documenting "if the officer uses their hands or feet for the use of force."  T. Bergeson Dep. 66:18-24.  The NLPD disciplined Officer Bergeson "in connection with his reporting of the incident," but did not discipline any of the other defendant officers.  Pl. Ex. 35, at 2.

On April 29, 2013, Mr. Miller filed this lawsuit against the various Defendants.  The operative complaint, the Third Amended Complaint, alleges four causes of action:  (1) Count One under 42 U.S.C. § 1983 alleging violations of the Fourth and Eighth Amendments of the U.S. Constitution against both the individual defendants for the use of excessive force and New London as a municipality for the maintenance of policies, practices, or customs resulting in the

use of excessive force by its police officers; (2) Count Two under 42 U.S.C. § 1983 against the

individual defendants for failure to protect Mr. Miller from the use of excessive force by New

London police officers; (3) Count Three for battery under Connecticut law; and (4) Count Four

for the intentional infliction of emotional distress under Connecticut law.

## II.      DISCUSSION

Defendants move under Federal Rule of Civil Procedure 56 for partial summary

judgment with respect to Mr. Miller's *Monell* claim against the City, all his claims against

Sergeant Pickett and Mr. Kuchyt, and all his claims brought under the Eighth Amendment.

Defendants acknowledge that there is likely a factual dispute that would preclude summary

judgment on the remaining excessive force claims.  Mr. Miller opposes Defendants' motion,

except as to his claims against all Defendants for intentional infliction of emotional distress,

contained in Count Four of his Complaint, and his claims against all Defendants under the Eighth

Amendment.

### A.      Standard for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that

there is no genuine issue of material fact to be tried and that the facts as to which there is no such

issue warrant judgment for the moving party as a matter of law.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 172 (2d Cir.

2005).  When ruling on a motion for summary judgment, the court may not try issues of fact, but

must leave those issues to the jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  Thus, the trial court's task is "carefully limited to discerning whether there are any

genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . .

to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs.,

Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed. R. Civ. P. 56(e)). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* Only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.*, 901 F .2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). However, the inferences drawn in favor of the nonmovant must be supported by evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment, *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997), as is the "mere existence of a scintilla of evidence in support of the [nonmovant's] position," *Anderson*, 477 U.S. at 252.

### B.    *Monell* Claim

A municipality is only subject to liability under § 1983 when the violation of the plaintiff's federally protected right is attributable to the enforcement or execution of a municipal

policy, practice, or custom.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "The policy or custom need not be memorialized in a specific rule or regulation."  *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir.1996).  Instead, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks and citation omitted).  Furthermore, "plaintiffs must show that the official policy, practice or custom was the 'moving force [behind] the constitutional violation,' [] which is to say that it actually caused the constitutional deprivation."  *Hernandez v. Conn. Court Support Servs. Div.*, 726 F. Supp. 2d 153, 156-57 (D. Conn. 2009) (internal citations omitted).

Mr. Miller argues that the City's allegedly deliberately indifferent failure to train and failure to supervise, as well as the purported custom of the NLPD not requiring its police officers to report bodily use of force, provide the basis for municipal liability in this case.  Inadequacy of police training and supervision may serve as the basis for § 1983 liability where the municipality's failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997) ("plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision").  Similarly, a *Monell* violation may be found where there is a departmental custom of not reporting certain types of incidents, to the extent there is a factual basis for claiming that the custom caused a constitutional violation.  *See*, *e.g.*, *Wrighten v. The City of New London Police Dep't*, 579 F. Supp. 2d 322, 326 (D. Conn. 2008).

In order to survive summary judgment, however, the non-moving party must "come forward with evidence that would be sufficient to support a jury verdict in his or her favor." *Id.* at 324. Because Mr. Miller has failed to point to evidence in the record that would establish genuine issues regarding the elements necessary to establish municipal liability, summary judgment must be granted as to this claim.

### 1.    Inadequate Training

For a finding of municipal liability under a theory of inadequate training, plaintiffs must "establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation," *i.e.*, "that 'the officer's shortcomings . . . resulted from . . . a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129-30 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 390-91). While a plaintiff "need only plead that the city's failure to train caused the constitutional violation" at the motion to dismiss stage, at the summary judgment stage, "[a]fter discovery, . . . a plaintiff is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation." *Id.* at 130 n.10. Plaintiff has not met the evidentiary burden necessary for sustaining a failure to train claim at this stage of the case.

To establish deliberate indifference with respect to training, a plaintiff must show that: (i) policymakers know to a moral certainty that city employees will confront a particular situation; (ii) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or there is a history of employees mishandling the

situation; and (iii) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.  *See Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007).  "[A] policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events."  *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir.1992). The Second Circuit also recognizes that deliberate indifference "involves the conscious disregard of the risk that poorly-trained employees will cause deprivations of clearly established constitutional rights."  *Amnesty Am.*, 361 F.3d at 127 n.8.  As a result, to satisfy the applicable legal standard for a failure to train claim, even if a plaintiff identifies specific training deficiencies, there also must be proof that these deficiencies are the result of deliberate indifference.  *Wray*, 490 F.3d at 196 ("Although Wray posits defects in the Department's testing procedures, Wray has put forth no evidence that these defects are the result of deliberate indifference.") (citing *City of  Canton*, 489 U.S. at 391).

Mr. Miller has pointed to evidence that the City was aware that its employees had been, and would continue to be, confronting the situation of severely intoxicated individuals at SCADD.  Conversations had occurred prior to Mr. Miller's arrest between high-ranking City officials and SCADD regarding ongoing problems between law enforcement and SCADD clients.  *See*, *e.g.*, Pl. Ex. 1; Pl. Ex. 7, at 8, 12.  The NLPD official policy on how to respond to incidents involving intoxicated or incapacitated persons, Pl. Ex. 34, indicates an awareness that dealing with intoxicated or incapacitated individuals presents police officers with the type of difficult situation that it would be reasonable to infer training would make less difficult.

Plaintiff, however, has failed to proffer any evidence regarding the City's actual training program for such situations, let alone evidence of any specific deficiencies "closely related to the ultimate injury" or probative of deliberate indifference.  The training-related evidence Plaintiff points to includes shortcomings in the proper use of body microphones during arrests and not

14

listening to music while driving to the scene of an arrest,[4] which are not probative of whether the City failed to train its officers adequately in engaging with intoxicated and incapacitated individuals.

To the extent that Plaintiff is claiming that the inconsistent reporting of the defendant officers' use of force in their arrest of Mr. Miller shows inadequacy of training, this argument alone, without supporting record evidence, fails to establish a genuine issue of material fact.  *See Amnesty Am.*, 361 F.3d at 130 (affirming a grant of summary judgment because, *inter alia*, "plaintiffs have provided no evidence tending to rule out those causes of the excessive force that would not support municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training, and therefore no reasonable factfinder could conclude that the excessive force occurred as a result of training deficiencies.").  Again, Plaintiff has not provided any record evidence on NLPD training programs, or the lack thereof, and even if he had, as discussed *infra* Section II.B.3, there are no facts in the record establishing a causal link between the alleged problems with use-of-force reporting and Mr. Miller's alleged constitutional injuries.

Therefore, Plaintiff's *Monell* claim for inadequate training must be dismissed.

### 2.      Failure to Supervise

Plaintiff also claims that the City failed to investigate the incident properly and to discipline the police officers who were involved as providing a basis for *Monell* liability.  The Second Circuit has held that a city's failure "to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force" can be a basis for municipal liability, *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 326 (2d Cir. 1986), and that "[a] municipality may be liable under § 1983 in cases of police brutality where the City's failure

---

[4]      *See*, *e.g.*, T. Bergeson Dep. 20:20-23:23.

to supervise or discipline its officers amounts to a policy of deliberate indifference," *Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999).  This claim also cannot be sustained.

In contrast to inadequate training cases, in which the "allegedly deficient training policy is often, though certainly not always, embodied in a written document[,] . . . claims of deficient supervision, including failure to investigate, and take remedial actions, are more likely to be based upon a municipal entity's practice or custom."  Martin A. Schwartz, *Sec. 1983 Litig. Claims & Defenses* § 7.18[B][1].  Here, Plaintiff's allegations amount to a challenge to the NLPD's supervisory practices concerning officers who have allegedly used excessive force, as evidenced by the NLPD's alleged failure to investigate and discipline the defendant officers adequately for their alleged violations of Mr. Miller's rights.

While it is true that a "failure to investigate [the challenged] incident and punish the responsible parties" is the "type of 'ratification of the illegal acts' . . . found to be a sufficient 'official policy' of" a municipality, *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989), Plaintiff has failed to provide record evidence to support such a finding here.  In fact, the record reflects not one, but two investigations into the incident at issue, and Plaintiff has not provided evidence that these were "uninterested and superficial."  *Fiacco*, 783 F.2d at 331. While one of the reviews was conducted by a stepbrother of one of the defendants, Officer Josh Bergeson, the actual use-of-force investigation was conducted by another member of the NLPD. Moreover, Captain Bergeson's administrative review contained numerous criticisms about how the arrest and its aftermath were handled and concluded that the incident exposed potential problems with inconsistent reporting on the use of force by NLPD officers.  The NLPD subsequently revised both the General Order and the Use-of-Force Report form to indicate explicitly that officers must report use of bodily force that results in injury or death and disciplined one of the defendant officers for his reporting of the incident.

"Even assuming that the City improperly failed to discipline" the officers involved in this incident, "the failure to discipline a single officer cannot give rise to an inference of deliberate indifference without further evidence of a municipal policy or practice." *Searles v. Pompilio*, 652 F. Supp. 2d 432, 445 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). In short, the record lacks evidence that there has been a "persistent failure to discipline subordinates who violate civil rights." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).

Therefore, Plaintiff's *Monell* claim of inadequate supervision based on the City's failure to investigate and discipline the police officers involved in the arrest of Mr. Miller is dismissed.

### 3.     Custom on Reporting Bodily Use of Force

Mr. Miller's third theory for *Monell* liability is premised on the NLPD having a custom or practice of its officers not reporting use of bodily force and the notion that this alleged custom caused the use of excessive force by the officers in effectuating his arrest. The basis for this theory is that NLPD officers did not believe they needed to report any bodily force on the Use-of-Force Report form provided by the NLPD, which Plaintiff argues caused the officers to feel unconstrained as to the degree of bodily force they used. Indeed, none of the police officers involved in Mr. Miller's arrest filed a Use-of-Force Report detailing all of the uses of force employed, in spite of the injuries suffered by Mr. Miller during the course of his arrest. Officer Bergeson testified that he did not report his punches to Mr. Miller's head[5] "because [the] use of force report at the time did not contain a section for hand strikes." J. Bergeson Dep. 15:24-25. Officer Pelchat did not report his use of knee strikes. *See*, *e.g.*, Pl. Ex. 7; Pl. Ex. 8; Pelchat Dep. 17:16-18:2, 23:16-25:11. Moreover, one of the NLPD officials who investigated the incident testified that NLPD police officers could assume that they did not have to report that they

---

[5]     The head is coded as a "red" area of the body by the NLPD, meaning it is "basically a deadly force zone." Pelchat Dep. 48:6.

punched or kicked a suspect if there was no place on the form to put it.  T. Bergeson Dep. 67:9-
14.

Plaintiff concedes, however, that "according to the [NLPD] reporting guidelines, officers
did in-fact have to report use of bodily force."  Pl. Br. at 16.  Recognizing that the General Order
in effect at the time clearly required police officers to report any use of force in which injury or
death was alleged to have resulted, Def. Ex. I, at 9, Plaintiff is not claiming that there was an
official policy directing officers to not report bodily use of force.  Rather, Plaintiff's allegations
amount to a claim that this was an unofficial custom or practice "so widespread as to have the
force of law." *Brown*, 520 U.S. at 404.

The undisputed record in this case, however, does not support the notion that there was a
custom in the NLPD of never reporting bodily force.  The NLPD General Order requires "a
detailed explanation of the use-of-force" in the incident or arrest report, even if not in the Use-of-
Force Report, and the arrest reports from the Miller incident revealed some of the use of physical
force by the officers that did not involve weapons, even if not all of it was reported.  In his initial
arrest report, Officer Pelchat reported that he "actively fought with the male to place him under
arrest for nearly thirty seconds," Def. Ex. H, and in his supplemental arrest report, "Officer
Lavimoniere stated that in attempt to gain compliance from Miller, he struck Miller three
separate times with a closed fist 'just above' Miller's left hip to get him to comply," Pl. Ex. 7, at
6.

There is no record evidence that any other officers beyond those involved in this incident
failed to report use of bodily force, or even that these officers themselves had failed previously to
report such use of force.  *See Newton v. City of New York*, 779 F.3d 140, 152 (2d Cir. 2015)
(requiring "a persistent, widespread course of conduct by municipal officials or employees that
has become the usual and accepted way of carrying out policy, and has acquired the force of law,

even though the municipality has not necessarily formally adopted or announced the custom" for

a finding that an alleged custom exists).  At most, the evidence supports an inference that the

Use-of-Force Report at the time was not always used to report the use of bodily force.

   To the extent that there was a "custom" regarding the reporting of bodily force, it was

that officers were not consistent with their reporting, an issue identified by an NLPD official,

Captain Bergeson, in his administrative review of the Miller incident.  There is no genuine issue

of material fact on the issue of whether NLPD has a custom of its officers never reporting the use

of bodily force.

   Even assuming that Plaintiff has proffered sufficient evidence that a custom exists, and,

at this stage of the case, "[t]he evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, he still must proffer some

evidence that this alleged custom actually caused the violation of Mr. Miller's rights.  *See City of

Canton*, 489 U.S. at 385 (the "first inquiry in any case alleging municipal liability under § 1983

is the question whether there is a direct causal link between a municipal policy or custom and the

alleged constitutional deprivation").  At oral argument, counsel for Plaintiff suggested the

following causal link:  officers know they can get away with using unreasonable bodily force

because they do not have to report it.

   This argument, however, is not supported by evidence in the record.  In fact, as noted

*supra*, the reporting by Officers Pelchat and Lavimoniere of some of the bodily force employed

during the arrest of Mr. Miller, which is undisputed, undercuts the notion that there was no

reporting of bodily force in the NLPD.  Moreover, even if the "custom" were inadequate

reporting by NLPD officers, Plaintiff has not provided facts supporting the existence of a causal

link between the alleged custom and his alleged injury.

Plaintiff could have provided documentation or testimony describing the nature of the NLPD's use-of-force reporting procedures, and how the NLPD generally handles such incidents. *Cf. Ewing v. Cumberland Cnty.*, No. 09-cv-5432, 2015 WL 1384374, at *28 (D.N.J. Mar. 25, 2015) (denying summary judgment where there was evidence that use of force reports "were not used to root out misconduct").  Yet, Plaintiff has not provided anything, even discovery of the NLPD's past Use-of-Force Reports and arrest reports, to show how NLPD officers generally fill out and describe their uses of bodily force.

There is no evidence that the NLPD ignored any prior incidents involving use of force. *See Harris v. Cnty. of King*, No. 05-cv-01121, 2006 WL 2711769, at *5 (W.D. Wash. Sept. 21, 2006) (granting summary judgment where "Plaintiff has failed to demonstrate how the City's omissions in following up on use of force reports *after the violation had already occurred* could possibly have been the 'moving force' behind the violation itself given that constitutional wrong had already taken place") (emphasis in original).  Plaintiff also has not proffered expert testimony to support a correlation between the NLPD's use-of-force reporting practices and incidents in which NLPD officers used excessive force.  *Cf. Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1040-41 (D. Colo. 2013) (denying summary judgment where plaintiffs proffered expert testimony supporting a causal link between the city's custom of allowing officers to under-report or not report use of force by its police officers and the degree of force used against the plaintiffs).

Instead, the record evidence is limited to evidence that these particular officers failed to report all of the specific details of their use of force in this arrest.  The only record evidence as to the reasons they were not fully forthcoming is that there was some individualized confusion as to what the reporting requirements were and one officer who stated that he was rushed in filling out his initial report because he had to go back out on patrol.  *See* J. Bergeson Dep. 14:14-17, 16:10-

14.  There is no evidence as to what other officers in the NLPD do or are trained to do.  Captain Bergeson's deposition testimony about how officers completed the Use-of-Force Report is limited to the reporting on that form only, not the incident or arrest reports and not the NLPD requirements for detailing everything that happened.

Without record evidence, there is no factual basis to infer that a custom of underreporting use of force by NLPD officers caused, or is even linked to, the degree of force used in this case. *See Quarles v. General Motors Corp. (Motors Holding Div.)*, 758 F.2d 839, 840 (2d Cir.1985) ("mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion"); *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988) ("there are cases where the evidence is so weak" as to "not raise a genuine issue of fact").  As a result, Plaintiff has failed to create a genuine issue of fact under this theory of municipal liability and his *Monell* claim under this theory must be dismissed.

### 4.    Alleged Policy Toward SCADD Clients

Finally, Plaintiff argues that there existed an unwritten "no-tolerance" policy towards SCADD clients, and that this purported policy caused the use of excessive force against Mr. Miller.  *See*, *e.g.*, Pl. Br. at 18.  Plaintiff alleges that high-ranking City officials resented the disturbances at times caused by SCADD clients, and that, as a result, they adopted an unwritten policy that NLPD officers called to SCADD were to arrest and jail such individuals instead of taking them to a hospital, regardless of their medical condition.  *See*, *e.g.*, *id.* at 5-6.  There is no evidence in the record to support the existence of such a policy.  Plaintiff's only "evidence" consists exclusively of purported statements by high-ranking City officials that intoxication is no excuse for assaults on police officers or firefighters, and that the City would not tolerate such behavior.  *See*, *e.g.*, Pl. Ex. 7, at 12; Pl. Ex. 1, at 1-2.  Such statements on their own cannot be the

basis for imputing to the City an unwritten policy that makes abuse of SCADD clients by its police officers more likely.

### 5.      Summary Judgment on *Monell* Claim

For all of the foregoing reasons, Mr. Miller's *Monell* claim must be dismissed at this stage of the case.

### C.      Constitutional Claims Against Sergeant Robert Pickett and Firefighter Michael Kuchyt

Mr. Miller asserts claims against Sergeant Pickett and Firefighter Kuchyt, in their individual and official capacities, for excessive force and failure to intervene under § 1983.

### 1.      Qualified Immunity

Defendants argue that, even if Sergeant Pickett and Firefighter Kuchyt violated Mr. Miller's constitutional rights, they are not liable due to qualified immunity.  State actors are entitled to judgment in their favor on constitutional claims, if they did not violate clearly-established rights about which a reasonable official would have known.  *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006).  However, "[a]lthough qualified immunity is a question of law, because [the] issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." *Maye v. Vargas*, 638 F.Supp.2d 256, 262 (D. Conn. 2009) (citing *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)).

### a.      Sergeant Pickett

As discussed *infra* Section II.C.2, it is disputed what actions Sergeant Pickett undertook or observed.  The extent of the force employed or observed by Sergeant Pickett, which presents a genuine issue of fact in this case, is determinative of whether he violated clearly-established constitutional rights.  Therefore, Defendants' motion for summary judgment on the excessive

force and failure to intervene claims against Sergeant Pickett on the basis of qualified immunity is denied.

### b.    Firefighter Kuchyt

Even drawing all reasonable inferences in favor of Mr. Miller, Firefighter Kuchyt's actions do not violate clearly-established rights about which a reasonable firefighter would have known.  Firefighter Kuchyt did not become involved in the altercation between the police officers and Mr. Miller until Officer Pelchat, who at the time was the sole police officer on scene, requested his assistance due to the difficulty he was having restraining the much larger man.  *See* Kuchyt Dep. 9:3-9, 15:15-16, 16:14-17:1.  There is no evidence in the record contradicting Firefighter's assertion that he was afraid that Officer Pelchat would have been injured by Mr. Miller had Firefighter Kuchyt not become involved.  *See* Kuchyt Dep. 18:24-25.  The extent of Firefighter Kuchyt's involvement was very limited.  The uncontradicted evidence in the record indicates that Firefighter Kuchyt assisted Officer Pelchat by holding one of Mr. Miller's arms, until other police officers arrived.  *See* Kuchyt Dep. 16:22-18:19.

A reasonable firefighter would have no reason to believe that assisting a police officer whom he believed to be in serious danger of harm, in such a limited manner as holding one arm while the police officer attempts to handcuff an actively resisting suspect, would inflict a violation of that suspect's clearly-established rights.  Moreover, a firefighter is not trained or experienced, nor expected to be trained or experienced, with use of force in police arrests.  While there is some evidence in the record that Officer Pelchat may have struck Mr. Miller with his knee while Firefighter Kuchyt was assisting him,[6] a reasonable firefighter would not be expected to know that this, by itself, could rise to the level of excessive force.

---

[6]    *See* Pelchat Dep. 26:24; Kuchyt Dep. 18:17-19.

The evidence also indicates that Firefighter Kuchyt was not in a position to observe any of the other allegedly excessive force that was used on Mr. Miller. The uncontradicted evidence indicates that Firefighter Kuchyt withdrew back to the side of the ambulance, which had an obscured view of the altercation. *See* Kuchyt Dep. 19:18-20:2. Firefighter Kuchyt testified that he could not see everything that was going on once he withdrew to that position, and that he did not recall witnessing any of the allegedly excessive force that was used on Mr. Miller. *See* Kuchyt Dep. 20:20-23, 21:23-25, 22:8-23; *cf.* Pl. Ex. 7, at 11-12. As counsel for Mr. Miller implicitly acknowledged during oral argument on this motion, there is no duty to intervene if a state actor cannot see, and is therefore not aware, that excessive force is being used. *See Disorbo v. Hoy*, 74 F. App'x 101, 104 (2d Cir. 2003) (holding it "objectively reasonable for [state actor] not to intervene for the simple reason that he never witnessed any constitutional violations").

For the foregoing reasons, Defendants' motion for summary judgment on the excessive force and failure to intervene claims against Firefighter Kuchyt on the basis of qualified immunity is granted.

### 2. Excessive Force Claim Against Sergeant Pickett

Defendants argue that Sergeant Pickett had no physical contact with Mr. Miller, and thus could not be liable for using excessive force on him. However, Mr. Miller has pointed to several witness statements that assert that there were four or five police officers who were employing physical force on Mr. Miller. *E.g.*, Pl. Ex. 1; Pl. Ex. 6; Pl. Ex. 7, at 13, 14.

Defendants counter that: (i) this evidence should not be considered because it has been submitted in the form of a police report and is thus hearsay; (ii) the references to a fourth or fifth police officer using force on Mr. Miller could have been a reference to Firefighter Kuchyt or Dr. Maiorano; and (iii) a video recording, which shows Sergeant Pickett arriving at SCADD at 19:38:40 and the officers escorting a handcuffed Mr. Miller to a police cruiser at 19:39:20, is

24

sufficient to establish that Sergeant Pickett did not have time to use any force whatsoever against Mr. Miller.  At this stage of the proceedings, these arguments fall short.

First, while a party may, on summary judgment, "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), this simply means that the evidence must be capable of presentation in admissible form at the time of trial; it does not require that the materials be presented in an admissible form on summary judgment.  *See Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.  Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses."); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents"), *cert. denied*, 541 U.S. 937 (2004); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir.1996), *aff'd*, 520 U.S. 781 (1997) (otherwise admissible evidence may be "submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form."); *Gordon v. Kaleida Health*, 299 F.R.D. 380, 393 (W.D.N.Y. 2014) ("Rule 56(c)(2) does not contemplate the exclusion of evidence based solely on the form of presentation").  Though the relevant witness statements in the police report comprising Plaintiff's Exhibit 7 are indeed submitted in hearsay form, it is clear that the content of these statements can be presented during trial in the admissible form of sworn witness testimony subject to cross examination.

Second, it is well-settled that, in ruling on summary judgment motions, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  With witnesses stating that they saw four police officers involved in

25

using physical force against Mr. Miller, the Court must infer that the witnesses were referring to the four actual police officers who were on scene, thereby implicating Sergeant Pickett.

Because Mr. Miller has pointed to evidence in the record that supports the existence of a genuine issue of material fact with respect to his excessive force claim against Sergeant Pickett, summary judgment with respect to this claim is denied.

### 3.    Failure to Intervene Claim Against Sergeant Pickett

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," and a police officer is liable for failing to intercede when excessive force is being used when there was "a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Defendants assert that Sergeant Pickett had no such opportunity because he did not observe the other police officers engage in the alleged use of excessive force, but only arrived after the officers had successfully subdued Mr. Miller.

As discussed *supra*, Section II.C.2, there is a genuine dispute regarding what Sergeant Pickett did or observed upon his arrival on scene. There is conflicting evidence submitted regarding whether Sergeant Pickett arrived too late to witness any use of force that may have been excessive. Therefore, there is a genuine issue of fact and summary judgment on this claim must be denied.

### D.    Common Law Tort Claims Against Robert Pickett and Michael Kuchyt

### 1.    Battery

Mr. Miller asserts claims against Sergeant Pickett and Firefighter Kuchyt for battery. Battery is defined under Connecticut law as the unlawful application of force or violence by one person to another. *Williams v. Lopes*, 64 F. Supp. 2d 37, 47 (D. Conn. 1999) (citing *Moriarty v.*

*Lippe*, 162 Conn. 371, 389 (1972)).  Such unlawful application of force may be committed

intentionally, recklessly, or negligently.  *Markey v. Santangelo*, 195 Conn. 76, 78 (1985).

However, a state employee acting in the discharge of his duties or within the scope of his

employment enjoys statutory immunity, in his individual capacity, for damages or injuries

inflicted negligently.  Conn. Gen. Stat. § 4-165.

Because the Court has found that there are genuine issues of material fact regarding the

application of force by Sergeant Pickett against Mr. Miller, as discussed *supra*, "it necessarily

follows that questions arise as to the reasonableness of [defendant's] use of physical force

pursuant to state law,"[7] *Clark v. Dowty*, No. 3:05-cv-1345, 2007 WL 2022045, at *14 (D. Conn.

July 9, 2007), and summary judgment on the battery claim against him is therefore denied.

However, summary judgment on the battery claim against Firefighter Kuchyt is granted.

Although it is true that "[c]ommon-law battery did not require any specific intent either to injure

or to touch offensively, but rather only a more general intent to commit the unlawful act," *United

States v. Delis*, 558 F.3d 177, 180 (2d Cir. 2009), battery still requires that "a harmful contact

with the person of the other directly or indirectly results," *Simms v. Chaisson*, 277 Conn. 319,

331 (2006) (quoting *Restatement (Second) of Torts* § 13 (1965)).  The Court finds that there is no

evidence to support an inference that Firefighter Kuchyt's act of briefly restraining Mr. Miller's

arm directly or indirectly caused  harmful contact with the person of Mr. Miller, and therefore

the claim of battery against Firefighter Kuchyt fails as a matter of law.

---

[7]     Conn. Gen.Stat. § 53a–22(b) provides in relevant part: "a peace officer . . . is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape."

### 2. Intentional Infliction of Emotional Distress

Mr. Miller has expressly abandoned his claims for intentional infliction of emotional distress. *See*, *e.g.*, Pl. Br. at 1. Therefore, these claims are dismissed.

### E. Eighth Amendment Claims

"The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes, [] and consequently the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (internal quotation marks and citation omitted). The alleged actions from which Mr. Miller's claims arise occurred pursuant to his arrest by the City and took place entirely prior to any criminal prosecution that may have been initiated against Mr. Miller. Moreover, counsel for Plaintiff explicitly abandoned this claim at the March 12, 2015 hearing on this motion. Therefore, summary judgment is granted with respect to Mr. Miller's claims against all Defendants under the Eighth Amendment.

## II. CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment is **GRANTED** in part and **DENIED** in part.

The Court **GRANTS** summary judgment in favor of the City of New London and Michael Kuchyt on all claims against them in the complaint. All claims against the City of New London and Michael Kuchyt are hereby **DISMISSED**. *The Clerk is directed to terminate the City of New London and Michael Kuchyt from this case.*

With regard to the remaining defendants, the Court **GRANTS** summary judgment in favor of Joseph Pelchat, Joshua Bergeson, Kurt Lavimoniere, and Robert Pickett on all claims against them brought under the Eighth Amendment and for Intentional Infliction of Emotional Distress. These claims are hereby **DISMISSED**.

The Court **DENIES** summary judgment, and the requests for qualified immunity, on all remaining claims.  The following claims remain for trial:  (1) the excessive force claims against Officers Pelchat, Bergeson, and Lavimoniere and Sergeant Pickett; (2) the failure to intervene claim against Officers Pelchat, Bergeson, and Lavimoniere and Sergeant Pickett; and (3) the battery claims against Officers Pelchat, Bergeson, and Lavimoniere and Sergeant Pickett.

**SO ORDERED** this 12th day of May, 2015.


   /s/ Victor Allen Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE